811 So.2d 464 (2002)
Kelli WESSON, Appellant
v.
FRED'S INC. and Lumbermen's Mutual Casualty Company, Appellees.
No. 2001-WC-00096-COA.
Court of Appeals of Mississippi.
March 12, 2002.
*465 John Raymond Tullos, Mark K. Tullos, Raleigh, attorneys for appellant.
Holly Bridges Wiggs, Ridgeland, attorney for appellee.
Before SOUTHWICK, P.J., LEE, and CHANDLER, JJ.
SOUTHWICK, P.J., for the Court.
¶ 1. Kelli Wesson suffered injuries to her right forearm while employed by Fred's, Inc. Wesson filed a claim under workers' compensation procedures and was awarded *466 only temporary total disability benefits. Still seeking permanent benefits, Wesson appeals. Here, she argues that the Commission erred in finding certain medical treatments were not reasonable and necessary, erred in its finding as to the date of maximum medical improvement, and erred in finding that she failed to establish her claim for permanent and total disability. We disagree. The Commission's decision is here upheld in all respects.

STATEMENT OF FACTS
¶ 2. Kelli Wesson was employed as a clerk in the apparel department of a Fred's store. Wesson's primary duty was to attach price tags and theft sensors to apparel prior to placement on racks for sale. Wesson's employment with Fred's began in late March 1996. During part of the summer she left Fred's for medical reasons unrelated to this claim but returned to work on August 9, 1996. On October 17, 1996, Wesson attempted to pick up a tagging "gun." The gun fell out of her hand. Wesson claims that she felt a sharp pain and then lost feeling in her right hand. She also claims that for several days prior to the incident she had experienced pain in her elbow, upper arm, wrist, and hand that she believes was caused by the repetitive motions of tagging clothing. Wesson asserts that she now has difficulty performing household chores, caring for her daughter, and conducting other everyday tasks. Normally right-handed, she has shifted to use of her left hand for many activities.
¶ 3. Wesson claimed that her employment caused her to develop carpal tunnel syndrome. In its answer, Fred's admitted to a work-related injury. The company alleged that Wesson was temporarily disabled during the period between October 18, 1996 and January 19, 1997 but had suffered no permanent disability. It paid benefits of $1,360.86. Fred's also denied liability for some of Wesson's medical treatment.
¶ 4. The parties stipulated at the administrative hearing that the records of Dr. Alan Freeland indicated a date of maximum medical improvement of January 20, 1997, but the records of Dr. Sheila Lindley reflected a date for maximum improvement of September 15, 1998. The employer had paid all of Wesson's medical bills from the date of the incident in 1996 to March 13, 1997, except for certain medical bills relating to treatment by Dr. Sam Fillingane. Two witnesses testified: Wesson and Marlon Fairchild, manager of the Fred's store at which Wesson had been employed.
¶ 5. The administrative judge found that payment for medical treatment rendered by certain doctors was not the responsibility of Fred's, that the date of maximum medical improvement was March 13, 1997, and that temporary disability benefits should be paid at the rate of $75.06 per week for the period beginning October 18, 1996 and ending March 13, 1997. The administrative judge also found that Wesson failed to establish any permanent disability.
¶ 6. The Commission affirmed except that it awarded temporary disability benefits only through January 20, 1997. The circuit court also affirmed with the exception of changing the date for terminating temporary disability benefits back to March 13, 1997. Wesson now appeals here.

DISCUSSION
¶ 7. We perform deferential review of decisions of the Mississippi Workers' Compensation Commission. Fact findings will be reversed only if they are not supported by substantial evidence. Sibley v. Unifirst Bank for Sav. Through Resolution *467 Trust Corp., 699 So.2d 1214, 1217-18 (Miss.1997). This case largely turns on the interpretation of the facts as opposed to disputes about applicable law. We will consider each issue with this review standard in mind.

1. Medical Treatment
¶ 8. Wesson argues that the medical treatments rendered by doctors Lindley, Summers, and Carpenter were reasonable and necessary. The Commission determined otherwise. Wesson also argues that the Commission failed to give appropriate weight to Dr. Lindley's opinion.

a. Reasonable and Necessary
¶ 9. An employer is to pay for medical treatments that are reasonable and necessary and that result from the work-related injury. In addition, there are procedural safeguards involved with the incurring of medical costs. The Workers' Compensation Act requires that an employer provide medical services to the injured employee commensurate with the "nature of the injury or the process of recovery." Miss.Code Ann. § 71-3-15(1) (Rev.2000). We summarize this statute's requirements. An employee may choose a personal physician or accept a physician chosen by the employer. The employer is also responsible for expenses of a physician to whom the claimant is referred by the original treating physician. An employee is allowed referral to one physician practicing "within a specialty or subspecialty area." Id. Referrals to additional physicians must be approved by either the employer or the employer's insurance carrier. Treatment rendered by a physician or referrals from a physician other than the original treating physician that have not been approved are not the responsibility of the employer or its insurance carrier.
¶ 10. On the day of the incident, Wesson sought treatment from a Dr. Trammel. Wesson next saw Vivian Pierce, a nurse practitioner in the same medical group. Pierce initially referred Wesson to a Dr. Bailey, a neurologist in Meridian. Wesson chose not to make an appointment with Bailey but instead requested Dr. Alvin Freeland. The administrative judge found Freeland to be Wesson's choice of personal physician. Freeland ordered certain tests to be performed by Dr. Dan E. Carpenter. These tests were found to be the responsibility of Fred's.
¶ 11. Wesson returned to Dr. Freeland twice in mid-February complaining of pain. Wesson requested that she be permitted to seek a second opinion. Fred's authorized a referral to Dr. Aubrey Lucas. Lucas performed several tests and in turn referred Wesson to Dr. Jeffrey Summers for pain management. Wesson chose not to seek treatment from Dr. Summers.
¶ 12. Prior to her last appointment with Dr. Freeland, Wesson sought treatment from Dr. Dan Fillingane, her family physician. Wesson stated that Fillingane treated her when she took her daughter to an appointment with Fillingane. Wesson admitted that Dr. Freeland did not refer her to Fillingane and neither Fred's nor its insurance carrier authorized any treatment by Fillingane.
¶ 13. Dr. Sheila Lindley was the next physician to examine Wesson. Wesson admitted that she was referred to Lindley by her attorney and not by Dr. Freeland. No authorization for the referral was sought. Lindley first examined Wesson in August 1997. Lindley requested that Dr. Carpenter perform certain tests. These tests were the same as those requested by Dr. Freeland. After further examination, Lindley recommended that Wesson undergo surgery, an option not recommended by either Freeland or Lucas. Lindley also *468 referred Wesson to Dr. Jeff Summers, the pain management specialist that Wesson earlier declined to see when referred by Dr. Lucas.
¶ 14. Dr. Lindley stated at her deposition that she had never reviewed the records nor even been aware of Dr. Lucas's treatment. After a review of Lucas's records, Lindley stated that one test she had ordered would not have been necessary. Lindley also stated that the surgery she performed could have been performed by an orthopedic surgeon such as Dr. Freeland.
¶ 15. The purpose of the statutory procedure for seeking medical treatment and permitting referrals from those initial physicians must in part be to systematize the means by which medical costs are to be imposed on an employer. When one party is responsible for another party's expenses, it is critical that some controls exist. The legislature has permitted an initial referral and required that additional referrals be first authorized by the employer and carrier. Miss.Code Ann. § 71-3-15(1) (Rev.2000). Wesson sought medical treatments from Dr. Lindley and Dr. Fillingane without such approval. Therefore, their expenses are not the responsibility of the employer and carrier.
¶ 16. Having detoured outside the statutory procedures for referrals and treatment, Wesson ultimately saw the same two doctors whom she had earlier failed to see after having been properly referred. The first doctor that Wesson belatedly saw was Dan Carpenter. Both employer-provided Dr. Freeland and improperly selected Dr. Lindley referred Wesson to Carpenter. He performed the tests on Wesson that Dr. Freeland had requested but did not perform them until Wesson followed through on the later referral.
¶ 17. The other doctor to whom Wesson was separately referred both by an employer-provided physician and by the personally selected doctor was pain management specialist Summers.
¶ 18. The Commission did not require that the charges of Carpenter and Summers be paid by the employer. The administrative judge, whose opinion was affirmed by the Commission, refused to provide for payment for Dr. Carpenter because Wesson saw him based on the recommendation of the wrong doctor. Further, the test was performed ten months after the initial referral, during a period of time that Wesson was not working. To the Commission (adopting the administrative judge's view), "there is no evidence that any discrepancies in the two test results [performed first by Dr. Freeland and then later by Dr. Carpenter] were caused by her employment."
¶ 19. Payment for Dr. Summers was refused because Lindley's referral was improper and because of the passage of a year after the proper referral. Unauthorized surgery had occurred since then, and pain management specialist Summers was more likely treating the results of that surgery than he was addressing the reasons that underlay the earlier referral.
¶ 20. We find that the Commission's rejection of these charges was proper. This is not a situation in which the claimant simply arrived at the same referred physician as she should have but after taking a brief detour through other physicians' offices. Events occurred after the time of the initial referrals that provided sufficient evidence for the Commission to find that the reasons for the initial referrals no longer applied.
¶ 21. The obligation for the financial cost of the treatments by Lindley, Carpenter, Summers, and Fillingane is Wesson's responsibility.

*469 b. Medical Opinion of Dr. Lindley

¶ 22. Wesson argues that the diagnosis given by Dr. Lindley should have been accepted and the conflicting diagnoses by doctors Freeland and Lucas should have been rejected.
¶ 23. Where there is conflicting medical testimony, the Commission has the responsibility to apply its expertise and determine which evidence is more credible. We will uphold that determination unless it is clearly erroneous. Moore v. Independent Life and Accident Ins. Co., 788 So.2d 106, 113 (Miss.Ct.App.2001).
¶ 24. The administrative judge examined all the medical records that were introduced. To understand the role played in Wesson's treatment by the doctors, we summarize the treatment. Dr. Freeland examined Wesson on eight occasions between November 7, 1996 and March 13, 1997. He conducted or ordered a physical exam, X-ray exam, analog pain test, sensory mapping, and nerve conduction study. Many of these tests were performed on an on-going basis. Freeland's prescribed treatment was therapy and also ultrasound. On January 16, 1997, Freeland noted that Wesson stated that she could return to work but not to her previous duties. Freeland released her for work as of January 20, 1997, and found that she had no permanent impairment.
¶ 25. Wesson returned to Freeland on February 13, 1997, complaining of a burning sensation in the wrist. The doctor noted that Wesson's right forearm showed signs of swelling. Freeland recommended a "carpal tunnel injection." Wesson visited Freeland one week later with the same complaints. Wesson next saw Freeland on March 13, 1997, at which time Freeland noted that Prozac prescribed by Wesson's obstetrician "almost completely alleviated her symptoms in her right arm and her need for pain medication." However, Freeland noted that Wesson still had some difficulty in performing everyday tasks and that he would continue seeing Wesson on an as needed basis. Wesson never saw Freeland again.
¶ 26. Dr. Lucas examined Wesson on February 25, 1997. Dr. Lucas noted that Wesson's "symptoms and examination do not lend themselves to a single diagnosis or a single treatment." Lucas prescribed Prozac for depression and noted that he did not believe that there were "a lot of therapeutic modalities available...." Dr. Lucas ordered both a bone scan and MRI of the right arm. Both exams revealed nothing abnormal. On February 28, 1997, Lucas referred Wesson to Dr. Jeff Summers and stated that absent any further findings that he would release Wesson for work with no restrictions. Wesson did not then seek treatment from Summers and never returned to Dr. Lucas.
¶ 27. The administrative judge noted that Wesson did not seek treatment from Dr. Lindley until August 13, 1997, five months after Wesson's last appointment with Dr. Freeland. At that initial visit, Wesson told Lindley that there had been "marked improvement in the amount of discomfort...." Neither Freeland nor Lucas had recommended surgery despite "thorough evaluations and significant testing" by both. The administrative judge also noted that Lindley did not perform surgery until almost one year after the date of injury and without knowledge that Wesson had been examined by Lucas. The administrative judge stated that he was "struck by the numerous different diagnoses set forth in Dr. Lindley's medical records throughout the course of treatment." Lindley stated that as of June 29, 1998, Wesson had reached maximum medical improvement. At a subsequent followup visit in October 1998, Lindley assigned *470 Wesson a thirty percent impairment rating to the right upper extremity. The administrative judge found that "the reasonableness and necessity of surgical intervention is called into question" by these events in Lindley's treatment.
¶ 28. We find that the Commission's reliance on the opinions of Drs. Freeland and Lucas over that of Dr. Lindley was not clearly erroneous.

2. Date of Maximum Medical Improvement
¶ 29. The accepted date of maximum medical improvement has changed at every level of review in this case. We note now and explain later that we continue that pattern. The administrative judge found the relevant date to be March 13, 1997, which was the day of Wesson's last appointment with Dr. Freeland. The Commission found the date to be January 20, 1997, which was when Wesson was released for work by Dr. Freeland. The circuit court accepted March 13, 1997.
¶ 30. Wesson argues that the date of maximum medical improvement should be June 28, 1998, a date fixed by Dr. Lindley. As noted before, the parties had stipulated at the administrative hearing that Dr. Lindley's records supported a date of September 15, 1998. Regardless, we have already found that the Commission was within its discretion in accepting the evidence provided from doctors Freeland and Lucas as being the most credible. The parties stipulated that if Dr. Freeland's opinions were accepted, that January 20, 1997, would be the date of maximum medical improvement.
¶ 31. We find no error in the Commission's acceptance of the date provided by the physician upon whom they properly relied. We therefore reverse the circuit court's contrary finding.

3. Permanent and Total Disability
¶ 32. Wesson alleges that she has a total and permanent disability. She bases this largely on a 1992 Supreme Court opinion that invoked a rebuttable presumption of such a condition when 1) "there is a finding of permanent partial disability," and 2) after reaching maximum medical recovery, the claimant "reports back to his employer for work, and the employer refuses to reinstate or rehire" the claimant. Jordan v. Hercules, Inc., 600 So.2d 179, 183 (Miss.1992). That constitutes a prima facie case of total disability which at least shifts the burden of going forward with evidence to the employer to prove the disability is only partial "or that the employee has suffered no loss of wage earning capacity." Id.
¶ 33. Jordan is one of those occasional cases in the workers' compensation area that in attempting to restate former case-law may just not have fully described it. To abandon elements of court-created presumptions is within the prerogative of the Supreme Court, but later precedents of that same court reinvigorated the older law which suggests Jordan was incomplete.
¶ 34. The pre-Jordan presumption required that a claimant with a permanent injury first prove a request to return to work and a refusal by the former employer; then the claimant must prove reasonable efforts to obtain work from other available employers. Thompson v. Wells-Lamont Corp., 362 So.2d 638, 640 (Miss. 1978). In at least one post-Jordan precedent, the Supreme Court recognized that Jordan had given only an abridged form of the presumption. In that later opinion, the Supreme Court quoted both the Jordan truncated iteration and the Wells-Lamont complete version, and then referred to the "Jordan/Thompson test." *471 Hale v. Ruleville Health Care Ctr., 687 So.2d 1221, 1226-28 (Miss.1997). This Court has previously noted the fluctuating articulations of the rule. McCray v. Key Constructors, Inc., 803 So.2d 1199, 1201-02 (Miss.Ct.App.2000); Entergy Mississippi, Inc. v. Robinson, 777 So.2d 53, 56 (Miss. Ct.App.2000).
¶ 35. Whatever we should assume the complete list of elements in the presumption to be, we find that the threshold for the presumption does not exist. The fact-finder must conclude that the employee has a permanent disability. Even under Jordan, it is only an employee who is suffering from a permanent work-related disability who gains a presumption that the effects are totally disabling. The Jordan rule creates a presumption that a permanent injury is totally disabling; it does not create a presumption that someone who had a temporary injury has a permanent one.
¶ 36. Here, the Commission found that Wesson did not suffer from any permanent impairment. We have upheld that finding, and it keeps even the Jordan version of the presumption from applying.
¶ 37. We also note that the parties contested whether Wesson offered herself to her former employer and was refused. There was testimony that Wesson made no attempt to return to her previous position at Fred's after being released by Dr. Freeland to return to work. Having rejected the 1998 date for maximum medical improvement, the Commission also could properly apply the Jordan or Wells-Lamont presumption as being applicable to events in 1997. Fred's was not placed in a position to refuse to rehire or reinstate Wesson.
¶ 38. Since we have found other elements of the presumption not to apply, we need only to examine the facts to support the Commission's decision that Wesson had not made reasonable efforts to find other work as required for the final element of the Wells-Lamont presumption to apply.
¶ 39. THE JUDGMENT OF THE CIRCUIT COURT OF SCOTT COUNTY IS REVERSED AS TO THE FINDING OF A DATE FOR MAXIMUM MEDICAL IMPROVEMENT AND IS AFFIRMED IN ALL OTHER RESPECTS; JUDGMENT IS RENDERED HERE ACCEPTING THE DATE FOR MAXIMUM MEDICAL IMPROVEMENT AS STATED IN THE ORDER OF THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, AND CHANDLER, JJ., CONCUR. BRANTLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.