IRVING, P.J.,
for the Court:
¶ 1. On January 23, 2007, Sara Pulliam filed a petition to controvert with the Mississippi Workers’ Compensation Commission (Commission), alleging that she had sustained compensable injuries to her back, right shoulder, and body as a whole on March 26, 2006, while working as a direct care worker (DCW) for the Mississippi State Hudspeth Regional Center (Hudspeth). Hudspeth admitted that Pul-liam had sustained compensable injuries to her back and right shoulder, but disputed the nature and severity of those injuries, including Pulliam’s contention that her Chiari malformation and cervical-spine problems were causally related to her work injury.
¶ 2. A hearing was held before an administrative judge (AJ), who found that Pulliam had reached maximum medical improvement (MMI) on July 1, 2006; that Pulliam failed to prove that she suffered permanent disability as a result of her injuries; that Pulliam’s average weekly wage at the time of the injury was $296.01; that Pulliam’s cervical spine and Chiari *866 issues were not causally related to her work injuries; that Pulliam’s other claims were barred by the statute of limitations; and that Hudspeth is responsible for medical expenses associated with Pulliam’s injuries to her right shoulder and the lumbar area of her spine. Pulliam requested that the Commission review the AJ’s decision. The Commission affirmed the AJ’s decision and clarified that the AJ “found that [Pulliam’s] lumbar [injury], thoracic [injury], and right[-]shoulder [injury were] compensable.”
¶ 3. Feeling aggrieved, Pulliam appeals and argues that: (1) the Commission erred in upholding the AJ’s erroneous decision to admit a medical report into evidence; (2) the Commission’s findings were not supported by substantial evidence; (3) the Commission erred in finding that “Pul-liam’s claims other than [the] injury to her back and right shoulder are barred by the statute of limitations”; and (4) the Commission erred in finding that Hudspeth was not responsible for certain medical expenses.
¶ 4. After a thorough review of the record, we affirm the Commission’s finding that Pulliam’s Chiari symptoms and cervical-spine issues were not causally related to her work-related injury. We also affirm the Commission’s finding that Hudspeth shall only be responsible for the medical expenses associated with Pulliam’s com-pensable injuries. However, we find that the AJ erroneously considered unauthenticated medical evidence. Because the AJ’s findings regarding Pulliam’s MMI date and her entitlement to permanent disability benefits, if any, rested largely on the erroneously considered evidence, we reverse the findings as to those issues and remand this case to the Commission for further proceedings consistent with this opinion.
FACTS
¶ 5. Pulliam began working for Hud-speth as a DCW in 2004. Prior to working for Hudspeth, Pulliam worked as a factory worker and a teacher’s aide. On March 26, 2006, Pulliam assisted two coworkers with a patient to prevent the patient from falling. After helping her coworkers with the patient, Pulliam began to feel pain in her lower back and right shoulder. She reported the incident to her supervisor, Ruby Glover, and completed an accident report. On the following day, Pulliam presented to Dr. Charles Ozborn, a family practitioner, and told him about the incident at work. Dr. Ozborn diagnosed Pul-liam with lumbar strain. Pulliam re-injured her back and shoulder in April 2006 while assisting a patient during the sounding of the fire alarm.
¶ 6. During the hearing in front of the AJ, Pulliam testified that her job responsibilities included assisting Hudspeth patients through the rehabilitative process. According to Pulliam, approximately forty percent of her job as a DCW involved lifting, prolonged periods of walking, and frequent squatting and bending. Pulliam insists that she was able to perform all of her job duties without assistance prior to her injury.
¶ 7. Pulliam stated that she missed a few days of work as a result of her injury, and she received workers’ compensation benefits for approximately one month af-terwards. When she returned to work at Hudspeth, Hudspeth transferred Pulliam to an earlier shift. Working the earlier shift required Pulliam to perform more lifting and more walking, with little opportunity to rest or take breaks. Because of her injury and the pain that she experienced while trying to perform her new job duties, she was ultimately unable to continue to work. Hudspeth eventually termi *867 nated Pulliam after she exhausted her leave time.
¶ 8. Pulliam testified that after Hud-speth terminated her, she conducted a job search, including contacting at least forty potential employers, but she was unable to find a job. She revealed during cross-examination that she completed only five out of forty job applications because some of the employers told her that they were not accepting applications. Pulliam stated that she continues to experience pain in her shoulder and back. She cannot sit for more than sixty minutes and cannot stand for more than twenty minutes. She takes medicine, but it does not help with the pain.
¶ 9. Glover testified that she was Pul-liam’s supervisor at Hudspeth while Pul-liam worked the night shift. Glover affirmed Pulliam’s contention that Pulliam did not have any problems performing her job duties prior to her injury. According to Glover, approximately seventy percent of the job as a DCW involves standing and approximately sixty percent of the job involves stooping and bending. DCWs that work the morning shift stand for approximately ninety percent of their shifts because the patients are involved in numerous activities during the morning shift, and the DCWs must accompany the patients to those activities.
¶ 10. Although Dr. Ozborn did not testify at the hearing before the AJ, the medical records completed by him were admitted into evidence, and he testified by deposition regarding the contents of the medical records. During his deposition, Dr. Ozborn noted that he had served as Pulliam’s primary physician for at least twenty years. Pulliam visited his office on March 27, 2006, the day after her on-the-job injury, complaining of pain located primarily in her lower and mid-back. Dr. Ozborn diagnosed Pulliam with lumbosa-cral strain and released Pulliam to return to work on March 28, 2006.
¶ 11. Pulliam returned to Dr. Ozborn’s office on April 17, 2006, with complaints of increased pain in her back. Pulliam informed Dr. Ozborn that her “lifting a patient at the Kilmichael [njursing facility” led to an increase in the pain in her back. After conducting a physical examination, Dr. Ozborn assessed Pulliam’s condition as a thoracic strain and a lumbosacral strain, which he classified as “an exacerbation or renewed strain compatible with the same type of injuries [that] she had initially[.]”
¶ 12. Dr. Ozborn examined Pulliam again on November 13, 2006. At this time, Pulliam complained of radicular pain, which radiated down her left leg. Prior to this time, Pulliam had started physical therapy, but was continuing to have difficulty with back pain. She visited Dr. Oz-born several more times. On January 3, 2007, Dr. Ozborn ordered an MRI based on the “persistence of her pain and the fact that she’d had th[e] new development of radicular pain.” The MRI revealed a disc protrusion that “could be symptomatic.” Dr. Ozborn opined that “in view of [Pulliam’s] history, and in view of the fact that she had pain that was compatible with this,” the disc protrusion could be the cause of the pain in Pulliam’s leg. The MRI also revealed a Chiari malformation. Dr. Ozborn explained that an irritation of the spine could pull the Chiari “further down and [make the Chiari] become symptomatic.” He placed Pulliam at MMI on September 18, 2007. Dr. Ozborn opined, to a reasonable degree of medical certainty, that Pulliam was “totally disabled to do any kind of work activity.”
¶ 13. Pulliam presented to Dr. John Davis, at Hudspeth’s request, for an employer medical examination on April 2, 2008. Dr. Davis analyzed Pulliam’s medical records and conducted a physical ex *868 amination of her. After conducting the physical examination and studying medical records from Dr. Ozborn and Dr. Hunt Bobo,[1] Dr. Davis opined, to a reasonable degree of medical certainty, that Pulliam’s Chiari malformation and the issues with her cervical spine were “completely unrelated in any way to any work injury[.]” He additionally opined that Pulliam’s ongoing pain in “her thoracic region and down into [the] lumbar region” as well as her “left leg discomfort .... [were] causally related to [her] work injury[.]” He also noted that he “would defer all questions about work[-]status restrictions, impairment[,] and MMI to a treating physical[-]medicine and rehab[-]medicine physician.” (Emphasis added).
¶ 14. Over Pulliam’s objections, the AJ also considered a report from Dr. David Collipp, who performed a second independent medical examination of Pulliam on November 21, 2008. Dr. Collipp opined that Pulliam suffered “a lumbar strain injury with some thoracic involvement.” According to Dr. Collipp, Pulliam’s back injury
did not lead to an aggravation of the pre-existing T6-7 disc protrusion, or the pre-existing Chiari I malformation. With consideration of the available medical records, this injury appears to have reached MMI within about three months, by July 1, 2006, although she never had complete resolution of her pain.
Dr. Collipp also assigned Pulliam a permanent-partial impairment rating of two percent for her consistent pain complaints. Further, Dr. Collipp found that while Pul-liam had considerable restrictions due to other medical issues, Pulliam had not suffered any permanent restrictions as a result of the lumbar or thoracic strain. He opined that
based upon a reasonable degree of medical probability, and her present physical examination, ... Pulliam is physically capable of performing light-medium work, with a maximum lift of about 35 pounds. This is not related to her physical complaints, or her report of . prior surgery. This is not related to her work injury. This is related to her .physical examination, and her overall habitus.
Pulliam objected to the admission of Dr. Collipp’s report because the report was notattached to an affidavit from Dr. Col-lipp or his medical-records custodian authenticating the report.
¶ 15. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 16. Our standard of review in workers’ compensation cases is well settled. This Court’s review “is limited to determining whether the [Commission’s] decision was supported by substantial evidence, was arbitrary and capricious, was beyond the scope or power of the agency to make, or violated [the claimant’s] constitutional or statutory rights.” Gregg v. Natchez Trace Elec. Power Ass’n, 64 So.3d 473, 475 (¶ 8) (Miss.2011) (citing Short v. Wilson Meat House LLC, 36 So.3d 1247, 1250 (¶ 17) (Miss.2010)). We remain mindful that “the Commission is the ultimate fact-finder and judge of the credibility of ... witnesses”; therefore, we “may not reweigh the evidence [that was] before the Commission.” Id. (citing Short, 36 So.3d at 1251 (¶ 23)).

I. Admission of Dr. Collipp’s Report

¶ 17. Pulliam argues that the AJ committed reversible error by allowing into *869 evidence Dr. Collipp’s report without proper authentication as required by Procedural Rule 9 of the Rules of the Mississippi Workers’ Compensation Commission. Hudspeth contends that the AJ properly admitted the report, as it was attached to Dr. Davis’s report, which Hudspeth submitted with an affidavit from Dr. Davis’s medical-records custodian.
¶ 18. Mississippi Code Annotated section 71-3-61 (Rev.2011) grants the Commission the power to write and enforce its own rules “conformable to [the] law which may be necessary to enable [it] effectively to discharge the duties of [its] office.” The Commission also has the “discretion to enlarge the scope of the record and relax [the] rules of discovery applicable to hearings.” Robinson Prop. Grp. v. Newton, 975 So.2d 256, 260 (¶ 8) (Miss.Ct.App.2007) (quoting Bermond v. Casino Magic, 874 So.2d 480, 484 (¶ 11) (Miss.Ct.App.2004)). In spite of the Commission’s discretion in applying and interpreting its own rules, “[d]ue process dictates that the Commission ... follow its own procedural[-]due[-]process principles in conducting its duties of administering workers’ compensation claims.” Id. (citing Bermond, 874 So.2d at 485 (¶11)).
¶ 19. Procedural Rule 9 provides, in pertinent part:
The medical records of examining or treating physicians, including narrative office notes, reports dictated by the physician in the ordinary course of his or her practice, and other records composed by the physician in his or her practice, may be introduced into evidence in lieu of direct testimony taken at the hearing or by deposition upon the following eonditions[:]
1.The party wishing to introduce such medical records shall notify opposing parties and the Commission by written notice served at least thirty (30) days prior to the scheduled hearing. The prehearing statement may suffice as notification under this rule.
2. A copy of the medical records shall be attached to the written notice.
3. There shall be submitted with the medical records a sworn statement of either the physician or the physician’s medical-records custodian stating that the attached medical records are a true and correct copy of the medical records of the physician as kept in the regular course of the physician’s medical practice.
4. The contents of the medical reports shall be subject to the same objections as to relevancy and competency as the testimony of the reporting physician had he or she been personally present to testify at the hearing. Any objection to the use of an affidavit must be made within fifteen (15) days after receipt by the objecting party of a notice of intent to use such affidavit.
(Emphasis added).
¶20. Here, Hudspeth gave sufficient notice to Pulliam that it intended to introduce Dr. Collipp’s report into evidence. However, according to the transcript provided on appeal, neither an affidavit nor Dr. Collipp’s report was attached to the notice. The notice that was given was á sentence incorporated in Hudspeth’s pre-hearing statement that Hudspeth intended to introduce Dr. Collipp’s report. At the hearing, Hudspeth presented an exhibit that contained both Dr. Davis’s and Col-lipp’s reports. An affidavit from Dr. Davis’s medical-records custodian, dated October 6, 2008, was attached to this exhibit. There was no affidavit attached to the exhibit from Dr. Collipp or his medical-records custodian, or a statement that Dr. Davis’s and Dr. Collipp’s medical-records custodian were one and the same person. *870 The affidavit that was attached reads, in part, as follows:
PERSONALLYAPPEARED BEFORE ME, ... [custodian’s name], medical[-]records custodian for John D. Davis IV, M.D., who, upon his/her oath, stated that the attached records are a true and correct copy of the medical records relating to the examination, evaluation, and/or treatment of the above-named claimant as generated in the regular course of medical practice of John D. Davis IV, M.D.
¶ 21. The record does not inform us as to how Dr. Collipp’s medical report became attached to Dr. Davis’s report. However, it is clear that it was not attached by Dr. Davis or his medical-records custodian. It is also clear that Dr. Davis did not refer Pulliam to Dr. Collipp. He did, however, suggest that the discomfort that Pulliam was experiencing in her lower back, thoracic region, and left leg “would best be treated by a board[-]certified or board[-] eligible physical or rehab[-]medicine doctor!,] as well as at least a trial of epidural[-]steroid injections by an inter-ventional[-]pain[-]management physician.” Pulliam saw Dr. Collipp after the Commission granted Hudspeth’s motion to compel her to do so. After Dr. Collipp completed his report, he sent a copy to Hudspeth’s attorney, who apparently compiled and presented the exhibit that contained both Dr. Davis’s and Dr. Collipp’s reports.
¶ 22. When Pulliam objected to the use of Dr. Davis’s medical-records custodian’s affidavit to authenticate Dr. Collipp’s report, Hudspeth noted that Dr. Davis and Dr. Collipp practice in the same clinic. Alternatively, Hudspeth argued that Pul-liam waived her challenge to the admission of Dr. Collipp’s report because she did not object to the use of the above-referenced affidavit within fifteen days of receiving notice that Hudspeth intended to use the affidavit. However, both of Hudspeth’s arguments fail.
¶23. First, it is clear that the affidavit from the medical-records custodian authenticates only Dr. Davis’s report, and not, as Hudspeth contends, Dr. Col-lipp’s report as well. Also, the record contains no evidence that Dr. Collipp sent a copy of his report to Dr. Davis, Therefore, it could not have been included by Dr. Davis or unintentionally commingled by him. While it is true that Dr. Davis and Dr. Collipp practice at the same medical clinic, it cannot be denied that they do not specialize in the same area of medicine. Furthermore, Hudspeth failed to present any evidence that the medical-records custodian who provided the affidavit attached to Dr. Davis’s report also serves as the medical-records custodian for Dr. Collipp. The fact that the doctors work in the same building does not eliminate Hudspeth’s responsibility to obtain authentication of the reports of both doctors through affidavits either from the doctors themselves or from their medical-records custodians.
¶24. Second, in spite of Hud-speth’s argument that Pulliam has waived her challenge to the admission of Dr. Col-lipp’s report, we find that Pulliam did not waive her objection to the use of the affidavit from Dr. Davis’s medical-records custodian to authenticate Dr. Collipp’s report. Procedural Rule 9 requires that any objection to the use of an affidavit to authenticate medical records or reports be made within fifteen days of the notice of intent to use the affidavit. It is clear from the record that Pulliam was not aware that Hudspeth intended to use the affidavit from Dr. Davis’s medical-records custodian to authenticate Dr. Collipp’s report until the day of the hearing before the AJ. Therefore, the fifteen days that the rule grants to Pulliam to object to the use of the affidavit had not expired prior to the *871 day of the hearing before the AJ, and her objection to Hudspeth’s use of the affidavit to authenticate Dr. Collipp’s report was timely. As stated, when Pulliam first received notice that Hudspeth was intending to use Dr. Collipp’s medical report, neither an affidavit nor the report was attached.
¶ 25. As such, we find that the AJ erred in admitting Dr. Collipp’s report into evidence without proper authentication of the report from either Dr. Collipp or his medical-records custodian.[2] With all due respect, we must say that the dissent’s suggestion — that Pulliam waived objection to the admission of Dr. Collipp’s medical report at the hearing because she did not timely object after being notified of Hud-speth’s intent to use the report — is just not supported by the record. Because the AJ relied heavily on Dr. Collipp’s report in determining whether Pulliam was entitled to disability benefits and in assessing impairment ratings, the Commission’s decision affirming the AJ’s findings is reversed, and this case is remanded to the Commission for it to determine Pulliam’s disability benefits, if any, using properly admitted evidence.

II. Disability Benefits

¶26. Pulliam contends that the AJ erred in finding that she had failed to prove that she was permanently disabled, that she had not reached MMI, and that her injuries, except the lumbar strain, thoracic strain, and the right[-]shoulder injury, were causally related to her work-related injuries.
¶ 27. This Court has reiterated thát in workers’ compensation claims, a claimant does not have to prove with absolute medical certainty that his work-related injuries were the cause of his disability. All that is necessary is that the medical findings support a causal connection. A causal connection may be established so long as there is medical testimony that supports a finding of disability.
Wayne Farms LLC v. Weems, 105 So.3d 1178, 1181 (¶ 8) (Miss.Ct.App.2012) (internal citations and quotation marks omitted) (quoting Frito-Lay Inc. v. Leatherwood, 908 So.2d 175, 180 (¶24) (Miss.Ct.App.2005)).
¶ 28. In spite of the erroneous admission of Dr. Collipp’s report, we cannot say that the AJ erred in finding that Pul-liam’s Chiari symptoms and cervical-spine issues were unrelated to her work-related injury, as Pulliam failed to present medical evidence that these issues were associated with or aggravated by her work-related injuries. Regarding the Chiari, Dr. Oz-born never opined that the Chiari was caused or aggravated by Pulliam’s work-related injury. He only stated that trauma to the spine could have made the Chi-ari symptomatic. Dr. Davis, on the other hand, opined, to a reasonable degree of medical certainty, that Pulliam’s Chiari and the issues with her cervical spine were not related to her work-related injury. Pulliam failed to present any medical evidence to rebut Dr. Davis’s opinions that her Chiari and cervical-spine problems were not connected to her work-related injuries. Therefore, we find that the Commission had substantial evidence to determine that Pulliam’s Chiari and cervical-spine issues were not causally related to her work-related injuries.
*872 ¶ 29. Regarding whether and when Pulliam had reached MMI, the AJ relied on Dr. Collipp’s report to find that Pul-liam reached MMI on July 1, 2006. However, as previously discussed, Dr. Collipp’s report was not properly authenticated and, consequently, should not have been considered by the AJ. Within the properly admitted medical evidence, both Dr. Davis and Dr. Ozborn offered opinions regarding whether and when Pulliam had reached MMI. Dr. Ozborn opined that Pulliam reached MMI on September 18, 2007. Dr. Davis stated in his report that he did “not believe that [Pulliam] ha[d] reached MMI yet,” but that he would “defer all questions about work[-]status restrictions, impairment^] and MMI to a treating physical[-]medicine and rehab[-]medicine physician.” Because the AJ determined Pulliam’s MMI date based on improperly admitted evidence, without any consideration of the medical evidence that was properly admitted, we reverse the AJ’s finding that Pulliam reached MMI on July 1, 2006, and remand this case to the Commission for a determination of whether and when Pulliam reached MMI from her injuries.
¶ 30. The Mississippi Supreme Court has stated that a workers’ compensation claimant is not entitled to permanent disability benefits until the claimant has reached MMI from her compensable injuries. Barber Seafood, Inc. v. Smith, 911 So.2d 454, 460 (¶25) (Miss.2005). It follows, then, that without a proper determination regarding whether Pulliam has reached MMI, it cannot be said that she is not entitled to permanent disability benefits. As such, we reverse the Commission’s finding that Pulliam is not entitled to permanent disability benefits and remand this case to the Commission for a proper determination of whether Pulliam is entitled to permanent disability benefits once an MMI date has been determined.

III. Statute of Limitations

¶ 31. In her third assignment of error, Pulliam argues that the AJ erred in finding that her “thoracic[-]injury [claim] and other claims were barred by the statute of limitations.” However, a review of the AJ’s order and the final order from the full Commission, reveals that the AJ determined that Pulliam’s injury to the thoracic region of her spine was compensable. Additionally, it is not clear from the record what “other claims” were barred by the statute of limitations. Accordingly, this issue is without merit.

TV Medical Expenses

¶ 32. As her final issue on appeal, Pul-liam asserts that the AJ erred in determining that Hudspeth is not responsible for the payment of medical expenses incurred “in connection with treatment of the Chiari I malformation, the disc herniation at T6-7, and the cervical spine.” This Court has stated that “[a]n employer is to pay for medical treatments that are reasonable and necessary and that result from the work-related injury.” Wesson v. Fred’s Inc., 811 So.2d 464, 467 (¶9) (Miss.Ct.App.2002). Here, as previously stated, Pulliam failed to present medical evidence that her Chiari issues, her disc herniation, and her cervical-spine issues resulted from her work-related injuries. Therefore, the AJ did not err in finding that Hudspeth would not be responsible for the medical expenses associated with the treatment of these injuries.
¶ 33. THE JUDGMENT OF THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION IS AFFIRMED IN PART AND REVERSED IN PART, AND THIS CASE IS REMANDED TO THE COMMISSION FOR FURTHER PROCEEDINGS CONSISTENT WITH *873 THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEES.
LEE, C.J., GRIFFIS, P.J., FAIR AND JAMES, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, ISHEE AND ROBERTS, JJ. MAXWELL, J., NOT PARTICIPATING.

. Dr. Bobo is a neurosurgeon who evaluated and treated Pulliam’s Chiari malformation.

. We also note that, according to the hearing transcript, the AJ never ruled on Pulliam’s objection. In fact, she admitted the exhibit containing Dr. Davis’s and Dr. Collipp’s reports for identification purposes only. However, it is clear that the AJ and the Commission relied upon Dr. Collipp’s report to reach their decisions in this case.