# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-WC-00337-COA

J.W. DUREN                                                                    APPELLANT

v.

EFFEX MANAGEMENT SOLUTIONS, LLC AND                          APPELLEES
GREAT AMERICAN ALLIANCE INSURANCE
COMPANY

| | |
|---|---|
| DATE OF JUDGMENT: | 03/04/2021 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEY FOR APPELLANT: | J.W. DUREN (PRO SE) |
| ATTORNEY FOR APPELLEES: | GINGER MOORE ROBEY |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 06/07/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND McCARTY, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     J.W. Duren sustained a back injury while working for Effex Management Solutions

LLC (Effex).  Duren sought workers' compensation benefits from Effex and its insurance

carrier, Great American Alliance Insurance Company (collectively, "the Employer/Carrier").

After a hearing on the matter, the administrative judge (AJ) entered an order denying Duren's

claim for permanent partial disability benefits and additional temporary total disability

benefits.  The AJ found that Duren failed to meet his burden of showing that he sustained a

permanent disability or a loss of wage-earning capacity.  The AJ also denied Duren's request

for the Employer/Carrier to pay for additional medical expenses incurred by Duren after he

reached maximum medical improvement (MMI). Duren filed a petition for review, and the Mississippi Workers' Compensation Commission (Commission) affirmed and adopted the AJ's decision.

¶2.     Duren now appeals and asserts, among other things, that the Commission's decision is not supported by substantial credible evidence. After our review, we find that the Commission's decision is supported by substantial credible evidence, and we therefore affirm.

**FACTS**

¶3.     Duren worked as a general laborer for Effex, a temporary staffing agency. Effex placed Duren at Luvata, a manufacturing company. On July 14, 2016, while building an air-conditioning coil at Luvata, Duren stepped down from a table, fell down, and injured his back.

¶4.     Four days after his injury, Duren went to the Dr. Arenia C. Mallory Community Health Center Inc. (Mallory Health Center) in Lexington, Mississippi, reporting back and leg pain. Duren was seen by Dana Roberts, a nurse practitioner. Roberts eventually referred Duren to Dr. Graham Calvert, an orthopaedic surgeon in Jackson, Mississippi.

¶5.     Dr. Calvert first started treating Duren in September 2016. Dr. Calvert ordered an MRI of Duren's lumbar spine, which indicated a disc herniation at L3-L4 and L4-L5. Dr. Calvert recommended that Duren receive steroid injections, and he placed Duren on a light sedentary work restriction, noting that if Duren's employer could not accommodate him, then

2

he should be off work until further notice.

¶6.     Duren returned to Dr. Calvert in October 2016. Dr. Calvert's notes from that appointment reflect that Duren reported feeling significant relief after receiving the steroid injections and that his leg pain had significantly improved. Duren reported that he still suffered a little bit of back pain. Dr. Calvert kept Duren limited to modified work duties.

¶7.     In December 2016, Duren followed up with Dr. Calvert. At his appointment, Duren reported that the effect of his steroid injections had worn off and that he suffered continuous pain down his left leg. Dr. Calvert compared Duren's updated MRI results to the September 2016 MRI results and observed that the L4-L5 herniation was resolving and "appears improved." However, Dr. Calvert noted that the L3-L4 disc herniation had not significantly changed since September and was now at a "symptomatic" level.

¶8.     Based on Duren's updated MRI results, Dr. Calvert performed an L3-L4 microdiscectomy on Duren in December 2016. At a follow-up appointment on March 10, 2017, Dr. Calvert reported that Duren's pain caused by the L3-L4 disc herniation "has completely gone." Dr. Calvert placed Duren at MMI with a whole-body impairment rating of three percent, and he released him to return to work with no restrictions.

¶9.     Duren returned to work on March 14, 2017. After working for a few hours that day, Duren informed his supervisor that he was in pain. Duren's supervisor advised him to go see his doctor. Duren attempted to make an appointment with Dr. Calvert, but he was unsuccessful. Duren instead went to Mallory Health Center, complaining of numbness and

3

tingling in his left leg. Roberts prescribed Duren anti-convulsant and anti-inflammatory medications to help with his pain.

¶10. Duren returned to work the next day, but after working several hours, he advised his supervisor that he was again suffering pain. Duren reportedly did not show up for work on March 16, 2017, and on March 17, 2017, Effex contacted Duren by telephone and terminated his employment.

¶11. The record shows that the Employer/Carrier paid Duren temporary total disability benefits at the rate of $332.37 per week from July 14, 2016, the date of his injury, through March 10, 2017, the date that Dr. Calvert placed Duren at MMI and released him to return to work without restrictions.

¶12. On April 5, 2017, Duren filed a petition to controvert alleging that he suffered a work-related injury to his back, his left-lower extremity, and his body as a whole while working for Effex. On April 14, 2017, the Employer/Carrier admitted that Duren suffered a compensable injury to his back. The parties stipulated that Duren had an average weekly wage of $498.47 at the time of the injury.

¶13. After filing his petition to controvert, Duren returned to the Mallory Health Center complaining of low-back pain and left-lower extremity numbness and tingling. Roberts prescribed Duren pain medication and referred him to a pain management specialist. Roberts also recommended that Duren receive an MRI of his cervical, thoracic, and lumbar spine.

¶14. Duren filed a motion to compel medical treatment, requesting that the AJ compel the

4

Employer/Carrier to approve and pay for his pain management treatment and medications prescribed by Roberts. Duren claimed that Roberts referred Duren to pain management for his continued back pain and numbness and tingling in his leg but that the Employer/Carrier denied authorization for the pain management referral. The record reflects an e-mail from the Employer/Carrier's counsel denying authorization of the referral for pain management. In the e-mail, counsel explained that Dr. Calvert is Duren's treating physician, and the pain management referral was from a nurse practitioner at Mallory Health Clinic and not from Dr. Calvert. Counsel stated that as far as she knew, "Dr. Calvert has not indicated that pain management is medically necessary."

¶15. In July 2017, the AJ determined that an independent evaluation would be helpful, and he ordered Dr. Philip Blount, a physical medicine and rehabilitation physician, to perform an independent medical examination (IME) of Duren. Dr. Blount evaluated Duren and issued his IME report. Dr. Blount agreed that Duren's disc herniations at L3-L4 and L4-L5 were related to his fall at work in July 2016. Dr. Blount disagreed with Dr. Calvert's three-percent whole-body impairment rating, explaining that he would instead assign an eight-percent whole-body impairment rating because the three-percent impairment rating only took into account Duren's L3-L4 disc herniation and not his L4-L5 disc herniation. Dr. Blount agreed that Duren reached MMI on March 10, 2017.

¶16. On November 11, 2017, the AJ entered an order denying Duren's motion to compel medical treatment. The AJ explained that Duren's "request for pain management is hereby

5

denied as the provider who referred claimant to pain management is outside the scope of medical providers in this claim, and pain management is also not reasonable and necessary as opined by Dr. Philip Blount in his Independent Medical Examination report[.]" The AJ also ordered Duren to undergo a comprehensive evaluation of his condition by Dr. Angela Koestler, a psychologist.

¶17. In April 2018, Duren's counsel requested that Dr. Blount clarify the opinions from his IME report. In response, Dr. Blount issued an additional report clarifying his findings. Dr. Blount opined that Roberts's recommendation that Duren receive a post-surgery MRI to diagnose the cause of his continued pain, as well as the prescribed pain medications, were all reasonable and medically necessary to treat Duren's work injury. Regarding Roberts's pain management referral, Dr. Blount stated that chronic pain from a work injury should be managed by a medical professional trained in pain management, and he agreed with transferring Duren from Roberts to a "higher level of care."

¶18. In May 2018, Duren filed another motion to compel medical treatment, temporary total disability benefits, and payment of medical bills. In this motion, Duren referenced Dr. Blount's report clarifying his opinions and opining that a post-surgery MRI and the pain medications were reasonable and necessary to treat Duren's work injury. Duren accordingly requested that the AJ order the Employer/Carrier to pay for Duren's medical bills from Mallory Health Center, asserting that this continued treatment was related to his work injury. Duren also requested that the AJ order the Employer/Carrier to (1) approve and pay for the

past and future expenses of his pain medicine, as well as an evaluation and treatment pain management, and (2) render temporary total disability benefits until Duren has been placed at MMI by his pain management physician.

¶19.    At the request of the Employer/Carrier, Dr. John Davis, a neurosurgeon, performed an "Employer's Medical Evaluation" on Duren.  Dr. Davis performed his evaluation and issued his report opining that as far as Duren's disc herniation at L3-L4, he "indeed was and remains at maximum medical improvement as of March 10, 2017."  Dr. Davis also testified that he agreed with Dr. Calvert's treatment protocol.  Dr. Davis recommended a post-surgery MRI of Duren's lumbar spine to determine if there was any remaining L5 nerve root compression.

¶20.    On October 25, 2018, Duren underwent a lumbar MRI scan.  Dr. Calvert and Dr. Davis reviewed the updated MRI and issued a report detailing their findings.  Neither doctor found anything on the scan to explain Duren's complaints of pain.  Dr. Calvert recommended "continued pain management, and/or physical medicine and rehab recommendations."  Dr. Davis also performed a myelogram and post-myelogram CT scan on Duren to determine if Duren suffered any L-5 nerve root compression, and after reviewing the scans, he found "no evidence . . . of any nerve root compression at any level."

¶21.    In January 2019, Duren filed a third motion to compel medical treatment, total temporary disability benefits, and payment of medical bills.  After a hearing, the AJ entered an order denying the motion on March 20, 2019.  The AJ found that "[b]ased on the

7

overwhelming evidence from the medical specialists, [Duren] reached MMI on March 10, 2017," and therefore Duren was not entitled to receive temporary total disability benefits after that date. The AJ also found that the treatment and prescriptions from the nurse practitioner at Mallory Health Center did not appear to be reasonable and necessary, and therefore the Employer/Carrier was not responsible for payment of these treatments and medications.

¶22. Duren filed a motion for reconsideration of the AJ's March 20, 2019 order. After a hearing, the AJ entered an order denying Duren's motion for reconsideration.

¶23. On February 20, 2020, Duren went to Dr. Neil Sloan, an internal medicine specialist, for an IME. Dr. Sloan prepared an IME report detailing his findings. In his report, Dr. Sloan opined that Duren had reached MMI as of February 20, 2020, the day of his exam. Dr. Sloan assigned Duren a fourteen-percent whole-person impairment rating. On March 2, 2020, Dr. Sloan issued an addendum stating that Duren would be precluded from returning to work that includes lifting twenty pounds, twisting, and bending or kneeling positions.

¶24. On June 16, 2020, the AJ held an evidentiary hearing on the merits of Duren's compensation claim. The issues in dispute included the nature and extent of temporary disability attributable to the work injury; the extent of any resulting loss of wage-earning capacity, and Duren's entitlement to any permanent disability benefits; and Duren's entitlement to ongoing medical treatment pursuant to the Mississippi Workers' Compensation Act and what treatment, if any, is reasonable and necessary treatment.

¶25. At the hearing, the AJ heard testimony from Duren and his wife, LaWanda Duren. The parties submitted Duren's medical records and IME reports into evidence, as well as the depositions of Dr. Blount, Dr. Calvert, and Dr. Davis. The AJ also considered the IME report issued by Dr. Koestler, the psychologist, in which Dr. Koestler opined that from a psychological standpoint, Duren had no impairment or restrictions from his July 2016 work injury and recommended that returning to "some type of employment" would be beneficial for Duren.

¶26. On September 2, 2020, the AJ entered a final order denying Duren's claim for permanent partial disability and payment of additional temporary total disability benefits and medical expenses. Addressing the issue of permanent partial disability benefits and loss of wage-earning capacity, the AJ recognized that Duren must first show that he suffered a permanent disability, and this disability must be supported by credible medical testimony. The AJ acknowledged that Dr. Calvert returned Duren to work without any restrictions, and that neither Dr. Blount nor Dr. Davis disagreed with Dr. Calvert's assessment that Duren could return to full-duty work. The AJ also found it "telling" that when Dr. Calvert released Duren to return to work, Duren expressed that he did not want to return to work and "catastrophicized" his pain. The AJ noted Dr. Calvert's testimony that he felt that Duren was malingering. The AJ also acknowledged that Dr. Blount felt that Duren could return to his prior activity level without any increased risk and that Dr. Davis found no evidence of any structural abnormality that was consistent with Duren's subjective complaints of pain. The

9

AJ accordingly found that Duren failed to meet his burden of proving that his work injury resulted in a permanent disability causing him to suffer a loss of wage-earning capacity, and he therefore denied Duren's claim for permanent partial disability benefits.

¶27. The AJ also determined that Duren was only entitled to temporary total disability benefits from July 15, 2016, until March 10, 2017, the date Duren was "clearly" placed at MMI. The AJ specified that these benefits would be made at the compensation rate of $332.33 per week. The AJ ordered that the Employer/Carrier would receive credit for any disability payments previously made.

¶28. As to Duren's claim seeking payment for continued medical treatment, the AJ ruled that Duren was entitled to continued reasonable and necessary treatment related to the work injury. However, the AJ reiterated his prior finding that the treatment, medications, and pain management referrals provided by Mallory Health Center after March 14, 2017, were not reasonable and necessary and therefore were not the responsibility of the Employer/Carrier.

¶29. Duren appealed from the order of the AJ to the Commission, and on March 4, 2021, the Commission affirmed and adopted the AJ's September 2, 2020 order. Duren now appeals.

## STANDARD OF REVIEW

¶30. In workers' compensation cases, the Commission is the ultimate finder of fact. *Walmart Assocs. Inc. v. Cauley*, 321 So. 3d 1216, 1227 (¶61) (Miss. Ct. App. 2021). "Our scope of review in workers' compensation cases is limited to a determination of whether the

10

decision of the Commission is supported by substantial evidence." *Id*. at (¶62). "We will only reverse the decision of the Commission if it is clearly erroneous and contrary to the overwhelming weight of the evidence." *Id*.

¶31. In the case before us, "the Commission's order affirmed the AJ's order without additional analysis." *Mabus v. Mueller Indus. Inc*., 205 So. 3d 677, 682 (¶21) (Miss. Ct. App. 2016). In such cases, "this Court will examine the findings of fact made by the AJ." *Id*. We "then look[] to the AJ's order for determination of the underlying issues." *Id*.; *see also Cauley*, 321 So. 3d at 1227 (¶61) ("When the Commission accepts the findings and conclusions of the administrative judge, this Court reviews those findings and conclusions as those of the Commission."). We review the Commission's application of the law de novo. *Gregg v. Natchez Trace Elec. Power Ass'n*, 64 So. 3d 473, 475 (¶9) (Miss. 2011).

**DISCUSSION**

**I.      Permanent Partial Disability and Loss of Wage-Earning Capacity**

¶32. On appeal, Duren argues that the Commission erred in finding that he sustained no permanent partial disability or loss of wage-earning capacity. Duren maintains that he submitted sufficient evidence to show that he suffered a permanent disability, and he claims that the AJ did not give proper weight to Duren's medical evidence. Duren asserts that in making his determination, the AJ improperly gave more weight to the medical evidence and opinions of Dr. Calvert and Dr. Davis. Duren also argues that because his employment at Effex was terminated due to his work-related injury, and he has been unable to earn the

11

wages that he was receiving at the time of his injury in the same or other employment, the Commission erred in finding that he suffered no loss of wage-earning capacity.

¶33. The Mississippi Workers' Compensation Act provides compensation to an employee "for disability . . . from injury . . . arising out of and in the course of employment, without regard to fault as to the cause of the injury[.]" Miss. Code Ann. § 71-3-7(1) (Rev. 2021). Mississippi Code Annotated section 71-3-3(i) (Rev. 2021) defines "disability" as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof *must be supported by medical findings*." (Emphasis added). The Mississippi Supreme Court has clarified that "[d]isability comprises (1) an actual physical injury; and (2) loss of wage-earning capacity." *Gregg*, 64 So. 3d at 475 (¶9) (internal quotation mark omitted). "In order to meet the definition of disability, the claimant must not be able to obtain work in similar or other jobs, and the claimant's unemployability must be due to the injury in question." *Smith v. Johnston Tombigbee Furniture Mfg. Co.*, 43 So. 3d 1159, 1165 (¶19) (Miss. Ct. App. 2010). The claimant bears the burden of proving both an actual physical injury and loss of wage-earning capacity. *Weathersby v. Miss. Baptist Health Sys. Inc.*, 195 So. 3d 877, 883 (¶24) (Miss. Ct. App. 2016) (citing *Gregg*, 64 So. 3d at 476 (¶11)).

¶34. Relevant to our discussion, the supreme court has stated that "[o]ne first must find that the claimant has a disability as defined by statute before analyzing the loss of wage-earning capacity." *Lott v. Hudspeth Ctr.*, 26 So. 3d 1044, 1049 n.1 (Miss. 2010). While both parties

agree that Duren suffered an injury, "that injury must rise to the level of a disability before it is compensable." *Id*. at (¶18). To determine the extent of Duren's disability in the case before us, "[t]his Court must look to the medical evidence." *Mabus*, 205 So. 3d at 683 (¶25).

¶35. At the hearing on the merits of Duren's claim, the AJ heard testimony from Duren and his wife, LaWanda Duren. The following medical exhibits were admitted into evidence: the depositions and medical reports from Dr. Calvert, Dr. Blunt, and Dr. Davis; the medical records from Mallory Clinic; the IME reports from Dr. Sloan and Dr. Koestler; and the return-to-work slips from Dr. Calvert and Mallory Health Center. The record shows that in July 2016, Duren fell at work and injured his back. Four days after his fall, Duren presented himself to Nurse Practitioner Roberts at Mallory Health Center, complaining of back pain. Roberts referred Duren to Dr. Calvert. Duren's first appointment with Dr. Calvert was on September 6, 2016. At the appointment, Duren complained of low-back pain that radiated down his left leg and lower thigh, along with what Dr. Calvert described as a "very straightforward left L5 radiculopathy." Dr. Calvert ordered an MRI of Duren's lumbar spine.

¶36. On September 9, 2016, Duren returned to Dr. Calvert for the results of the MRI. Dr. Calvert testified that the MRI results showed a L3-L4 disc herniation impinging upon the nerve, as well as a disc herniation at L4-L5. Dr. Calvert recommended physical therapy and steroid injections as treatment. Dr. Calvert also restricted Duren to light sedentary work with a ten-pound lifting restriction. Dr. Calvert noted that if Duren's employer could not accommodate him, then Duren should be off work until further notice.

¶37. Duren followed up with Dr. Calvert on October 25, 2016. According to Dr. Calvert's notes from this appointment, Duren reported that he felt "significant relief" after his steroid injections. Dr. Calvert noted that Duren still suffered "a little bit of back pain" with L5 radiculopathy, but he reported that Duren's "leg pain is significantly improved." After examining Duren, Dr. Calvert found that Duren had a normal gait and a normal motor, sensory, and reflex neurologic exam. Dr. Calvert kept Duren at modified work duty with instructions to follow up in six weeks.

¶38. Duren returned to Dr. Calvert for a follow-up appointment on December 1, 2016. At this appointment, Duren complained that his pain had worsened and that the steroid injection had worn off. Dr. Calvert testified that at the December 2016 visit, Duren "was very symptomatic over the L3 dermatologic pattern." Dr. Calvert explained that Duren's "pain pattern changed from that of an L5 radiculopathy to a very straightforward L3 radiculopathy." Dr. Calvert ordered a repeat MRI of Duren's lumbar spine.

¶39. According to Dr. Calvert, the December MRI results showed that Duren's L3-L4 disc herniation was bigger compared to the image from the September 2016 MRI. However, Duren's L4-L5 disc protrusion had improved. Dr. Calvert explained that Duren still had a "slight protrusion" at L4-L5, but "it was not as . . . big as the previous protrusion" shown on the September 2016 MRI. Dr. Calvert testified that after viewing the December 2016 MRI images and performing an evaluation on Duren, he determined that Duren's L4-L5 disc "was not an issue anymore." Dr. Calvert testified that because Duren's L3-L4 disc herniation

14

"looked worse" on the December 2016 MRI than it did on the September 2016 MRI, he decided to perform a left L3-L4 microdiscectomy on Duren.

¶40. On December 12, 2016, Dr. Calvert performed a microdiscectomy on Duren. Duren returned for a follow-up visit on December 27, 2016. Dr. Calvert testified that at that visit, Duren "state[d] his radiating leg pain was gone," but he complained of numbness and weakness in his thigh. Dr. Calvert testified that complaints of numbness and tingling two weeks after surgery is normal because the nerve needs time to recover.

¶41. Dr. Calvert saw Duren again on January 27, 2017, approximately six weeks after his surgery. Dr. Calvert testified that at this appointment, Duren informed him that his leg still hurt, but when Dr. Calvert questioned Duren about the pattern of the pain or where the pain was located, Duren's explanation "did not follow any specific dermatologic pattern." Dr. Calvert explained that Duren stated that his pain "was really over the whole leg. He was just like, 'My whole leg hurts.'" Dr. Calvert testified that in his opinion, "[i]t didn't really make sense from an anatomic standpoint or from an injury standpoint or from a nerve root impingement standpoint what was causing the leg pain or if the leg pain was real, or if [Duren] was just exhibiting some odd behavior because he wasn't quite ready to go back to work." Dr. Calvert explained that "most people at six weeks from a microdiscectomy are completely returning to all normal activities and have no leg pain." At that point, Dr. Calvert recommended that Duren receive physical therapy.

¶42. Dr. Calvert confirmed that Duren did attend physical therapy, and that when Duren

15

returned to see Dr. Calvert on March 10, 2017, Duren reported that he was better. During the March 10, 2017 appointment, Dr. Calvert also noted that Duren's L3 nerve root compression was completely resolved and that Duren was pain-free. Dr. Calvert prescribed Duren a pain medication, as well as anti-inflammatory medications, for limited use if Duren developed any muscle pain upon returning to work. Dr. Calvert concluded that Duren reached MMI on March 10, 2017, and he assigned Duren a whole-body impairment rating of three percent. Dr. Calvert testified that his three-percent impairment rating was "generous." Dr. Calvert released Duren to return to work with no restrictions, and he instructed that no follow up was necessary unless Duren developed a new disc herniation.

¶43. Regarding pain management, Dr. Calvert testified that he did not feel that a pain management referral was reasonable or medically necessary at that point because Duren was not having a lot of pain, if any pain at all. As for Duren's prior L4-L5 nerve compression, Dr. Calvert testified that Duren never complained of pain over an L5 dermatologic pattern after the September 9, 2016 appointment.

¶44. Dr. Calvert stated that he was surprised to hear that four days after he assigned Duren at MMI, Duren sought treatment from Roberts at Mallory Health Center for back and leg pain. According to Dr. Calvert, at the March 10, 2017 appointment, Duren's leg pain was gone.

¶45. Dr. Calvert testified that "from the get-go," Duren "made it pretty clear" that he did not want to go back to work at his former job. Dr. Calvert said he was concerned that Duren

16

was "malingering" due to his "catastrophicized" pain complaints. Dr. Calvert testified that Duren's complaints and behavior were consistent with what he has seen from other patients who "utilize [Workers] Comp and are malingering," explaining that he has seen that type of behavior "a lot."

¶46. Duren's medical records from Mallory Health Center show that on March 14, 2017, the same day he returned to work without restrictions, he went back to the health clinic, complaining of back and leg pain and left-leg numbness and tingling. The records show that Duren had an abnormal gait and that he walked stiffly and slowly. Roberts prescribed Duren medications to relieve his pain. Duren returned to Mallory Health Center in April 2017 and October 2017, both times complaining of back and leg pain and left-leg numbness and tingling. At these appointments, Roberts prescribed Duren more medications to relieve his pain, and she instructed him to follow up with Dr. Calvert. At Duren's request, Roberts also referred Duren to a pain management specialist.

¶47. Dr. Blount, a physical medicine and rehabilitation physician, performed an IME of Duren in September 2017. In his IME report, Dr. Blount acknowledged Duren's "well documented work injury," and he opined that Duren's multiple-level disc herniations (L3-L4 and L4-L5) were related to his fall at work on July 14, 2016. After examining Duren and reviewing his medical records, Dr. Blount reported that he disagreed with the three-percent whole body impairment rating assigned by Dr. Calvert. Dr. Blount stated that he would instead assign an eight-percent whole-body impairment rating, explaining that the three-

17

percent impairment rating only took into account Duren's L3-L4 disc herniation and not his L4-L5 disc herniation. Dr. Blount agreed, however, that Duren reached MMI on March 10, 2017.

¶48. During Dr. Calvert's deposition, he reviewed Dr. Blount's IME report and testified that he agreed with Dr. Blount's whole-body impairment rating for Duren of eight percent based on the rationale that Duren had two disc herniations rather than one. Dr. Calvert testified that he thought a cumulative impairment rating of eight percent was "appropriate." He explained that when he assigned the three-percent impairment rating, he was referring to the L3-L4 disc, and he was not thinking about the L4-L5 disc. Dr. Calvert acknowledged that although he did not perform surgery on the L4-L5 disc, he did treat Duren for pain stemming from that disc herniation. When questioned further, Dr. Calvert stated that he would have given the L3-L4 disc a three-percent impairment rating and the L4-L5 disc a three-percent impairment rating, for a cumulative impairment rating of six percent. Dr. Calvert opined that a six-percent whole-body impairment rating would be "more appropriate" than an eight-percent impairment rating.

¶49. Dr. Blount testified that when he examined Duren for the IME in September 2017, Duren was not pain free. Dr. Blount suggested a post-surgery MRI with contrast to assess whether Duren has a recurrent disc herniation or scar formation from the surgery. Dr. Blount stated he believed that when a patient has ongoing complaints after surgery, ordering a repeat MRI with contrast "would be [the] standard of care."

18

¶50.   In September 2018, Dr. John Davis performed an Employer's Medical Evaluation on Duren, per the Employer/Carrier's request.   After examining Duren and reviewing his medical history and records, Dr. Davis issued his report.  Dr. Davis stated that Duren suffered a work-related injury to his lumbar spine that involved two levels: L3-L4 and L4-L5.  Dr. Davis opined that as far as Duren's lateral disc herniation at L3-L4, he "indeed was and remains at maximum medical improvement as of March 10, 2017."  Dr. Davis also testified that he agreed with Dr. Calvert's treatment protocol of Duren.

¶51.   Dr. Davis opined that the ongoing pain Duren complained of in his low back, consistent with the L5 nerve root, "is directly causally related" to his work injury.  Dr. Davis explained that from a radiculopathy perspective, Duren "is left with almost exclusively L5 (or SI) distribution symptoms."  Dr. Davis agreed that an MRI of Duren's lumbar spine was "reasonable, appropriate, and needed" to determine "whether there is any significant or persistent ongoing left-sided L5 nerve root compression."

¶52.   After reviewing Duren's updated MRI and CT scans from October 2018, Dr. Davis determined that the scans showed no evidence of any structural abnormality that was consistent with or fit with Duren's ongoing subjective complaints of pain.  Dr. Davis reported that he did not see any residual herniated disc at L3-L4, and he determined that "the issues at L3-L4 are largely moot certainly from a surgical perspective."  Dr. Davis also stated that "[m]ost importantly, on the left side at L4-L5, there is not a hint of a left L5 nerve root compression."

¶53.   Dr. Calvert also reviewed the October 2018 MRI results, and he provided a report stating that the MRI results revealed "scar tissue, granulation tissue around the exiting left L3 nerve root consistent with postoperative changes."  Dr. Calvert stated that "[t]here is a clear delineation between this scar tissue and the disc margin[,]" and he found that "[t]his does not appear to be a recurrent disc herniation or free fragment."  Dr. Calvert stated that he found nothing on the MRI that would warrant a revision surgery or a change in Duren's work status.  Dr. Calvert also stated that the new MRI "does not shed any light or explanations" for Duren's continued complaints of pain.

¶54.   In his final order, the AJ found that Duren "failed to meet his burden of proof that his work injury resulted in a permanent disability causing him to suffer a loss of wage[-]earning capacity," and the AJ denied Duren's claim for permanent partial disability benefits.  The AJ's order reflects that in making his decision, he relied "most heavily" on the opinion of Dr. Calvert, as Duren's treating physician.  The AJ found that "for the most part, Dr. Calvert's opinions are supported by the opinions of Dr. Blount, Dr. Davis, and Dr. Koestler," while the medical opinions of Roberts and Dr. Sloan were "out of line" with the opinions of the other doctors.  The AJ explained that he gave "little, if any, weight" to Roberts's medical opinion, because the AJ had previously entered an order finding that her treatment of Duren was not reasonable or necessary.  The AJ also stated that he gave "little weight" to the opinions of Dr. Sloan because Dr. Sloan did not see Duren until February 20, 2020, and Dr. Sloan failed to comment on the appropriateness of any of the treatments or opinions of Duren's previous

20

physicians. Dr. Sloan's report also does not reflect whether he reviewed any records or findings from Dr. Davis or Duren's most recent MRI or CT scan.

¶55. After our review, we find that the record contains substantial credible evidence to support the Commission's determination that the medical evidence in this case did not support a finding of a permanent impairment. Dr. Calvert concluded that Duren reached MMI on March 10, 2017, and he released Duren to work without any restrictions. Dr. Davis and Dr. Blount performed their own examinations of Duren, and the record shows that they did not disagree with Dr. Calvert's findings as to MMI and work restrictions. Additionally, Dr. Calvert and Dr. Davis reviewed Duren's most recent MRI and found nothing on the scan to explain Duren's ongoing complaints of pain. We recognize that "subjective complaints of debilitating pain unsupported by any medical proof of an underlying physical cause may, if found credible by the finders of fact, support a claim for disability." *Wagner v. Hancock Med. Ctr.*, 825 So. 2d 703, 706 (¶11) (Miss. Ct. App. 2002). However, the AJ did not find Duren's subjective complaints of pain to be credible.

¶56. As to Duren's claim that the AJ improperly gave more weight to the medical testimony and evidence provided by Dr. Calvert and Dr. Davis, this Court has held that "where there is conflicting medical testimony, the Commission has the responsibility to apply its expertise and determine which evidence is more credible." *Weathersby*, 195 So. 3d at 882 (¶21). Accordingly, "where medical expert testimony is concerned, the [s]upreme [c]ourt has held that whenever the expert evidence is conflicting, the Court will affirm the Commission

21

whether the award is for or against the claimant." *Id*. (quoting *Raytheon Aerospace Support Servs. v. Miller*, 861 So. 2d 330, 336 (¶13) (Miss. 2003)).

¶57.    In addition to medical evidence, "[a]nother consideration in determining whether a claimant has a disability is her wage-earning capacity." *Lott*, 26 So. 3d at 1049 (¶16). "A rebuttable presumption of no loss of wage-earning capacity arises when the claimant's post-injury wages are equal to or exceed his preinjury wage." *Gregg*, 64 So. 3d at 476 (¶12). The supreme court has held that a claimant can rebut this presumption by presenting evidence that

> the post-injury earnings are unreliable due to: increase in general wage levels since the time of accident, claimant's own greater maturity and training, longer hours worked by claimant after the accident, payment of wages disproportionate to capacity out of sympathy to claimant, and the temporary and unpredictable character of post-injury earnings.

*Id*. Additionally, "any factor or condition which causes the actual post-injury wages to become a less reliable indicator of earning capacity will be considered, including the claimant's inability to work, continuing pain, and loss of access to the job market." *Kroger Co. v. Pybus*, 327 So. 3d 678, 684 (¶19) (Miss. Ct. App. 2021) (internal quotation mark omitted).

¶58.    The record reflects that after Dr. Calvert released Duren at MMI with no work restrictions, Effex had work available for Duren and allowed him to return to his duties. Duren did not dispute that upon returning to work, he continued to earn the same wages post-injury. Accordingly, a rebuttable presumption arose in this case that Duren suffered no loss

of wage-earning capacity. After our review, however, we find that Duren failed to show that his post-injury wages were unreliable; therefore, he failed to overcome this presumption.

¶59. Duren returned to work at Effex on March 14, 2017, but he started feeling "excruciating pain," and he left work after a few hours. Duren returned to work the next day, but he left early again when the pain returned. Duren did not show up to work on March 16, 2017, and Effex terminated his employment on March 17, 2017. Duren testified that he tried to return to work at Effex, but he was in too much pain to perform his duties. Duren also testified that he had applied for over one hundred jobs after he was fired, but he has not received a job offer.

¶60. Although Duren failed to earn any wages after March 17, 2017, "he did not prove that this loss of earnings resulted from his injury." *Mabus*, 205 So. 3d at 685 (¶39); *see also Wagner*, 825 So. 2d at 706 (¶10). As discussed, the AJ found that the medical evidence did not support a finding of permanent impairment. We have held that an "incapacity to earn wages and the extent thereof must be supported by medical findings, but the requirement is met when the fact and extent of incapacity is corroborated in part by medical testimony." *Id*. (citation and internal quotation marks omitted) (quoting *Greenwood Utils. v. Williams*, 801 So. 2d 783, 791-92 (¶31) (Miss. Ct. App. 2001)). Accordingly, we find that Duren "could not show how his post-injury wages were unreliable, or that his later loss of wages resulted from his injury." *Mabus*, 205 So. 3d at 686 (¶45).

¶61. The AJ ultimately determined that Duren failed to present persuasive medical

evidence that his work injury resulted in a permanent disability that caused him to suffer a loss of wage-earning capacity. After our review, we find the Commission's decision denying permanent partial disability benefits was supported by substantial evidence.

## II. Temporary Total Disability Benefits

¶62. Duren and the Employer/Carrier agree that Employer/Carrier paid Duren temporary total disability benefits from July 14, 2016, the date of his injury, until March 10, 2017. Dr. Calvert placed Duren at MMI on March 10, 2017. Duren argues that because Dr. Sloan found that he did not actually reach MMI until February 20, 2020, the Commission erred by failing to award Duren temporary total disability benefits from March 2017 until the present.

¶63. "Temporary disability, whether total or partial, has reference to the healing period following injury[] until such time as the employee reaches the maximum benefit from medical treatment." *Flowers v. Crown Cork & Seal USA Inc.*, 167 So. 3d 188, 191 (¶12) (Miss. 2014). "Whether and when a claimant has reached maximum medical recovery are questions which are to be determined by the Commission based on testimony from both lay and medical witnesses." *Id.* at (¶11); *see also Chestnut v. Dairy Fresh Corp.*, 966 So. 2d 868, 871 (¶6) (Miss. Ct. App. 2007).

¶64. As the AJ acknowledged, the record shows that both Dr. Blount and Dr. Davis stated that they either agreed with or deferred to Dr. Calvert's finding of MMI. Only Dr. Sloan disagreed with this finding, and he instead found that Duren reached MMI "as of" February 20, 2020, the same day that Dr. Sloan examined Duren.

24

¶65. As stated, "where there is conflicting medical testimony, the Commission has the responsibility to apply its expertise and determine which evidence is more credible." *Weathersby*, 195 So. 3d at 882 (¶21). "We will uphold that determination unless it is clearly erroneous." *Wesson v. Fred's Inc.*, 811 So. 2d 464, 469 (¶23) (Miss. Ct. App. 2002). Here, the AJ stated that he gave "little weight" to Dr. Sloan's opinions because "they are far out of line with Dr. Calvert, Dr. Blount and Dr. Davis" with regard to MMI and the impairment ratings. Dr. Sloan's report does not document a review of any records or findings from Dr. Davis, nor did he document any review of Duren's October 2018 MRI or CT scan.

¶66. After our review, we find that the Commission's determination that Duren reached MMI on March 10, 2017, was supported by substantial evidence.

### III. Denial of Treatments, Medications, and Reimbursement for Mileage at Mallory Health Center after Reaching MMI

¶67. Duren argues that the Commission erred in failing to hold the Employer/Carrier responsible for his treatment, medications, and mileage at Mallory Health Center. Duren claims that after he returned to work and suffered back and leg pain, Dr. Calvert refused to treat him, and Duren had no choice but to seek treatment from Roberts at Mallory Health Center. Duren further argues medications and treatments prescribed by Roberts were all reasonable and medically necessary to treat Duren's work injury.

¶68. The record reflects that on March 14, 2017, four days after Dr. Calvert placed Duren at MMI and released him to work without restrictions, Duren went to Mallory Health Center complaining of back and leg pain, as well as tingling and numbness in his left leg. Roberts

25

evaluated Duren and observed that he was walking stiffly and slowly with an abnormal gait. Roberts prescribed him Gabapentin, a medication used to relieve nerve pain, and Mobic, an anti-inflammatory medication used to relieve pain.

¶69.   Duren returned to Mallory Health Center on April 19, 2017, again complaining of back and leg pain, as well as weakness and left-leg numbness and tingling.  The notes from the appointment showed that Duren wanted to be referred to a specific pain management doctor in Jackson, Mississippi.  Roberts prescribed Duren Ketorolac Tromethamine, an anti-inflammatory medication used to relieve pain, for his back pain, and she also increased his dosage of Gabapentin.  Roberts also referred Duren to a pain management clinic, and she instructed him to follow-up with Dr. Calvert on his existing back issues to see if another surgery was needed.

¶70.   Duren followed up at Mallory Health Center on October 4, 2017.  Roberts recommended an x-ray of Duren's spine.  She also recommended that he undergo another MRI of his cervical, thoracic, and lumbar spine without contrast.  Roberts also prescribed Hydrocodone Acetaminophen.  Duren underwent an x-ray of his spine that same day, which revealed mild facet arthropathy (arthritis).

### A.    Medications

¶71.   In Dr. Blount's April 27, 2018 report clarifying his IME findings, he agreed that Roberts's prescriptions for Gabapentin, Ketorolac Tromethamine, and Hydrocodone were related to the treatment of Duren's work injury.  Dr. Blount also testified that it is reasonable

26

for a patient to go see a provider if he is still having pain after surgery. Dr. Blount stated that, ideally, the patient would return to the treating physician, but often the patient returns to his primary care physician or a nonsurgical provider for his postoperative pain. Dr. Blount specifically agreed with Roberts's use of the medication Gabapentin to treat Duren, stating that it is his first choice for patients with lumbosacral radiculopathy, like Duren. Dr. Blount recommended increasing Duren's dosage of Gabapentin.

¶72.	Dr. Calvert, however, opined that the medications Roberts prescribed Duren were not reasonable or necessary. Dr. Calvert explained that Gabapentin is a pain medication meant to modulate the nerve, and Duren complained of back pain, so Gabapentin would not be indicated and therefore would not be a medically reasonable treatment. Dr. Calvert stated that when he released Duren on March 10, 2017, he did not need these medications because his leg pain was gone. Dr. Calvert testified that if Duren's back pain and leg pain was significant enough for him to seek medical treatment four days after being released at MMI, Mobic would be a reasonable and necessary medication to treat Duren, but only for the limited time period of a month or less.

¶73.	In response to Duren's claim that Dr. Calvert refused to treat him after Duren returned to work, Dr. Calvert testified that he was not aware that Duren had contacted him. Dr. Calvert explained that he will typically see a patient if the patient experiences problems after being released from treatment. During the deposition, counsel for the Employer/Carrier informed Dr. Calvert that the AJ ordered the Employer/Carrier to contact Dr. Calvert's office

27

and ask him to see Duren for a follow-up visit, and counsel was told that Dr. Calvert was not willing to see Duren and had nothing further to offer. Dr. Calvert testified that as far as he could recall, Duren never contacted him, and Dr. Calvert did not recall "closing the door" on follow-up treatments for Duren "other than saying he's at [MMI]." Dr. Calvert stated that it had been too long for him to remember if he closed the door on treating Duren or if "workers' compensation" closed the door on further treatment. Dr. Calvert also testified that when he closes a workers' compensation case and places someone at MMI, then "the case is closed" from a workers' compensation perspective, and he is unwilling to see a patient back for complaints that they think stem for the previous workers' compensation claim. Dr. Calvert explained that "sometimes it can be difficult because I have to protect my clinic from [workers' compensation] patients who are trying to take advantage of the system and continuing wanting to get follow-up and follow-up, and which can make it very difficult for me to see patients and continue to provide care for the rest of the community." Dr. Calvert testified that he had concerns that Duren was "malingering," explaining that Duren made it clear that he did not want to return to work and that he "catastrophicized" the pain.

### B. Pain Management and Physical Therapy

¶74. Duren also argues that the Commission erred in denying Duren reasonable medical treatments, pain management, physical medicine, and physical therapy as recommended by his doctors, including Dr. Blount, Dr. Davis, and Dr. Calvert.

¶75. On April 8, 2021, after filing his notice of appeal from the Commission's order, Duren

28

filed a letter with the Full Commission in which he requested several corrections to the record. Duren also asserted as follows:

> Dr. [Calvert] agreed to look over [the] last MRI done on October 25, 2018 and make a determination [as to] whether I should continue with medical treatments due to my work injuries. He clearly states he recommended I, J. W. Duren, continued pain management and/or physical medicine and rehab recommendations. I don't see where [the Employer/Carrier] have given me any of these treatment after or before December 7, 2018, [(the date of Dr. Calvert's report issuing this finding)]. I have been denied medical treatments per treating Dr. Calvert for [four] years.

The Full Commission entered an order on June 15, 2021, finding that "[t]his appears to be an argument for the appellate court to consider rather than any objection to the content of the record. The argument has to do with treatment allegedly recommended by Dr. Calvert and not approved by Employer and Carrier."

¶76. The record reflects that Duren filed several motions to compel medical treatment and specifically requested that the AJ "enter an [o]rder instructing the Employer and Carrier to approve and pay for [Duren's] referral to pain management treatment." The AJ entered an order denying the motions, with the most recent order being the March 20, 2019 order. In that order, the AJ denied Duren's third renewed motion to compel medical treatment after finding that the treatments prescribed by Mallory Health Center were not reasonable and necessary. The AJ's September 2, 2020 final order, which the Commission affirmed and adopted, stated that Duren "is entitled to continuing medical treatment under the Act as long as it is reasonable, necessary and related to the claimant's work injury[.]" The AJ specifically incorporated his March 20, 2019 order into the final order.

29

¶77.    Turning to review the medical evidence regarding Duren's pain management referral, the record reflects that Dr. Davis testified that he did not recommend a referral to pain management. Dr. Davis testified that after looking at the imaging from Duren's MRI, he saw that the pathology had been successfully addressed. Dr. Davis explained that subjective pain is pain that cannot be corroborated. Dr. Davis testified that the MRI scan and CT scans showed no evidence of any structural abnormality that was consistent with or fit with Duren's ongoing subjective complaints of pain.

¶78.    When asked whether he agreed with the nurse practitioner's referral to pain management, Dr. Blount responded that "[c]hronic pain related to a postsurgical Workers' Compensation case should be managed by a medical professional trained and familiar with the process. I would agree to transfer from [the] nurse practitioner to [a] higher level of care. Services rendered, however, would need to be reviewed prior to my opinion." During his deposition, Dr. Blount clarified that if pain is still a problem for Duren, "it is possible that some degree of self-management, some degree of pain management, and possibly a position with work limitations or restriction, could get Mr. Duren back in the workplace" without the use of Ultram or opiods.

¶79.    Dr. Calvert disagreed with Dr. Blount's opinion that Duren could benefit from being evaluated by a pain management specialist, explaining, "Dr. Blount says that [Duren] has axial related pain and only intermittent leg symptoms, and Dr. Blount even said that [Duren] does not qualify for axial injections, so I really don't understand what the point of the pain

30

management physician is in this particular case." However, Dr. Calvert issued an updated report on December 7, 2018, after reviewing Duren's October 25, 2018 MRI results. Dr. Calvert found that the new MRI "does not shed any light or explanations" for Duren's continued complaints of pain, and "[f]or this reason[,] I see no reason to evaluate Mr. Duren for revision surgery or changes in treatment." Dr. Calvert then stated that he recommended "continued pain management, and/or physical medicine and rehab recommendations."

### C.   Reimbursement

¶80.   In his final order, the AJ found, after reviewing the medical evidence, that "[n]othing submitted at the merit hearing changed this [AJ's] opinion" regarding the treatments or medications prescribed by Mallory Health Center after Duren reached MMI on March 10, 2017. The AJ reiterated his findings from his March 20, 2019 order where he found that the medications and treatment provided by Mallory Health Center were not reasonable and necessary and were therefore not the responsibility of the Employer/Carrier. The AJ incorporated this prior order into his final judgment. The AJ also stated that based on these findings, the Employer/Carrier were not responsible for any mileage reimbursement for travel to Mallory Health Center or to pick up medications prescribed by Mallory Health Center. The record shows that the AJ considered Dr. Calvert's December 7, 2018 report in his March 20, 2019 order as well as in his September 2, 2020 final order ruling on the merits of Duren's compensation claim.

¶81.   After our review, we find that the Commission's decision was supported by

31

substantial evidence in the record and was not clearly erroneous.

¶82.    We find that while the Commission did deny Duren's requests for pain management and payment of the medications prescribed by Roberts as not a reasonable or necessary medical treatment, the Commission did not make any findings regarding physical therapy. However, we do not see in the record where, or if, Duren requested payment for physical therapy or a referral to physical therapy.  Roberts did not recommend physical therapy as a treatment for Duren, nor did Roberts refer Duren to a physical therapist.

## IV.    Additional Claims of Error

¶83.    Finally, Duren claims that the AJ failed to enter and weigh all the evidence submitted by Duren, Dr. Blount, and Roberts, including Dr. Sloan's February 20, 2020 IME report and addendum, the physical therapy report from Tyler Holmes Rehab, Duren's CT scan from January 8, 2019, and his MRI from October 25, 2018.

¶84.    The record on appeal before us contains the medical records from Roberts at Mallory Health Clinic; the IME report and deposition of Dr. Blount; Dr. Sloan's IME report and addendum; as well as reports from Dr. Davis and Dr. Calvert stating the results from Duren's CT scan and MRI.  As stated above, the AJ had the responsibility to determine which of the conflicting medical evidence was more credible, and we find that the AJ's determinations, and thus the Commission's, were supported by substantial credible evidence.

¶85.    The record does not, however, contain any report from Tyler Holmes Rehab or Duren's actual CT scan and MRI.  Duren, as the claimant, bears the burden of proving that

his work injury resulted in a permanent disability causing him to suffer a loss of wage-earning capacity, and this disability must be supported by medical findings. Duren had the opportunity to submit his physical therapy report and the actual CT scan and MRI at the evidentiary hearing before the AJ, and the record reflects that he did not submit these documents. "[T]his Court only considers the medical evidence properly admitted before the AJ and Commission." *Mabus*, 205 So. 3d at 683 (¶28). Therefore, we decline to further address this claim.

## Conclusion

¶86. After our review, we find that the Commission's decision that Duren failed to prove that he suffered a permanent disability is supported by substantial evidence. Therefore, we affirm the Commission's denial of permanent partial disability benefits. For the reasons set forth above, we also affirm the Commission's decision awarding temporary total disability benefits until March 10, 2017, the date of MMI, and denying medical treatments or prescriptions recommended by Roberts, as well as mileage reimbursement, after Duren reached MMI.

¶87. **AFFIRMED.**

**BARNES, C.J., GREENLEE, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**